NATIONAL BANK OF COMMERCE OF KANSAS CITY, MO., et al. v. ROCKEFELLER.

(Circuit Court of Appeals, Eighth Circuit.   October 15, 1909.)

No. 2,861.

1. GUARANTY (§ 37*)—CONSTRUCTION OF CONTRACT—COMMENCEMENT.

It is a rule of very general application that all guaranties are prospective and not retrospective in operation, unless the contrary appears by express words or by necessary implication; and a written guaranty given to a bank of all debts which a corporation "may from time to time contract or become liable for to said bank, however said debts may be contracted or evidenced," cannot be construed to cover a note previously given by the corporation to the bank, nor renewal notes, given after the guaranty was executed, for the sole purpose of extending the time of payment of the same indebtedness.

[Ed. Note.—For other cases, see Guaranty, Cent. Dig. § 46; Dec. Dig. § 37.*]

2. GUARANTY (§§ 3, 27*)—REQUISITES—PAROL GUARANTY.

A parol statement, made by a prospective stockholder of a corporation to the president of a bank, that he would like to have the corporation do business with the bank, and that he "was going to give a guaranty to protect" the bank, did not constitute a guaranty, nor a present binding promise to give one, but was only an expression of a general purpose to do something, which would not bind him until done; nor can it affect the construction of a subsequently given written guaranty, clear and definite in its terms, which must be conclusively presumed to express the final agreement of the parties and to measure their rights and obligations.

[Ed. Note.—For other cases, see Guaranty, Dec. Dig. §§ 3, 27.*]

3. BILLS AND NOTES (§ 103*)—CONSIDERATION—MISREPRESENTATIONS.

Where a guarantor of an indebtedness from a corporation to a bank, in settling his liability to the bank after the corporation became insolvent, accepted the representations of the bank, implied, if not expressed, that a note of the corporation then held by the bank represented an indebtedness which was all within the guaranty, and paid the full amount due thereon in cash and by giving his own note, but it afterward appeared that the note so taken up was in large part in renewal of an indebtedness antedating the guaranty and not covered thereby, his own note to that extent was without consideration, and on payment of the remainder he was entitled in equity to its cancellation.

[Ed. Note.—For other cases, see Bills and Notes, Dec. Dig. § 103.*]

4. SUBROGATION (§ 7*)—GUARANTOR.

A corporation executed to a bank its note, which recited that "to secure the payment of this note, and of any and all other indebtedness which we now owe to said bank, or may owe it any time before the payment of this note, we have hereto attached as collateral security the following notes, * * * and hereby authorize [the cashier], * * * on default in the payment of this note, * * * to sell said collateral." Held, that such collateral was pledged primarily to secure payment of the note to which it was attached, and secondarily, but no less effectually, to secure the payment of any other indebtedness owing by the corporation to the bank when such note matured, and that a guarantor who paid the note was not entitled by subrogation to the collateral, where a prior indebtedness of the corporation to the bank remained unpaid.

[Ed. Note.—For other cases, see Subrogation, Dec. Dig. § 7.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. APPEAL AND ERROR (§ 169*)—GROUNDS OF REVIEW—NECESSITY OF PRESENTA-
TION IN LOWER COURT—EQUITY CAUSES.

   In an equity case, which is tried on appeal de novo, it is not necessary
that every reason for or against a decretal order should be presented to
the trial court; but if the pleadings warrant the contention, and there be
an assignment of error warranting its consideration, it is the duty of the
appellate court to decide it.

   [Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 169.*]

6. GUARANTY (§ 36*)—CONSTRUCTION OF CONTRACT—GUARANTY OF "DEBTS."

   A contract of guaranty is to be strictly construed, and a guaranty exe-
cuted to a bank of the payment of any "debt" which a corporation may
"contract or become liable for to said bank" cannot be enlarged to render
the guarantor liable on guaranties by the corporation of collateral notes
pledged by it to the bank, which guaranties did not constitute debts of
the corporation, but were merely executory contracts, on which its lia-
bility was contingent.

   [Ed. Note.—For other cases, see Guaranty, Cent. Dig. § 38; Dec. Dig.
§ 36.*

   For other definitions, see Words and Phrases, vol. 2, pp. 1864–1886;
vol. 8, p. 7628.]

Appeal from the Circuit Court of the United States for the West-
ern District of Missouri.

Suit in equity by Frank Rockefeller against the National Bank of
Commerce of Kansas City, Mo., and others. Decree for complainant,
and defendant bank appeals. Modified and affirmed.

This was a suit in equity, brought by Frank Rockefeller against the National
Bank of Commerce of Kansas City, to secure the cancellation and surrender
of a certain promissory note, dated August 16, 1901, for $36,229.05 (hereafter
referred to as the $36,000 note), executed and delivered by him to the bank,
and to secure the delivery to him of certain notes secured by chattel mort-
gages which the bank had taken from the Siegel-Sanders Live Stock Commis-
sion Company, a corporation, as collateral security for the payment of debts
due it from that company, and which Rockefeller claimed to have paid, and
therefore to be entitled to be subrogated to the rights of the bank with respect
to them. The Circuit Court entered a decree in favor of complainant, both
for the cancellation of the note, and subrogating him to the rights of the bank
to the collateral notes and mortgages as claimed. The bank appeals.

Rockefeller was a stockholder and director in the commission company,
whose business consisted of buying and selling live stock on commission at
Kansas City, Mo., and loaning money on cattle, taking notes secured by chattel
mortgages to evidence the loans. He lived in Cleveland. Ohio, and had not, prior
to the transactions involved in this suit, taken any active part in the conduct
of the business of the commission company. That was left to Frank Siegel,
the president, and R. D. Swain, the secretary and treasurer. The company, not
having sufficient capital to carry on business of the magnitude desired by its
officers, attempted to borrow money from banking institutions for that pur-
pose; but the banks exacted as a condition to such accommodations the per-
sonal guaranty of the officers of the company and of Rockefeller that its debts
should be paid. One of these banks was the defendant the National Bank of
Commerce, and the guaranty exacted by it and executed by Rockefeller and
others was in the following words:

"For a valuable consideration to us in hand paid by National Bank of Com-
merce of Kansas City, Missouri, we, the undersigned, do hereby agree to make
and guarantee to the National Bank of Commerce of Kansas City, Missouri,
any and all debts which the Siegel-Sanders Live Stock Commission Company,
a corporation doing business in Kansas City, Missouri, may from time to time
contract or become liable for to said bank, however said debts may be con-
tracted or evidenced. This guaranty shall be an open one and cover debts

aggregating two hundred thousand ($200,000) dollars at any one time, and shall continue at all times unconditional until revoked by us; and for the consideration aforesaid we hereby waive all notice to us or either of us of the beginning or ending of credit which said bank may give to said company under this guaranty, or of the state of its indebtedness at any or all times. Witness our hands this 21st day of January, 1901.

"[Signed]    Frank Siegel.
"R. D. Swain.
"Frank Rockefeller."

On January 9, 1901, prior to the giving of the guaranty, the commission company had borrowed $45,000 from the bank and executed its promissory note therefor, pledging as collateral security for its payment various notes secured by chattel mortgages. The bank claims this indebtedness was covered by the terms of the guaranty when properly interpreted, and also that it was contracted on the strength of an oral agreement made by Rockefeller to guarantee its payment or to execute a written guaranty to that end. This note matured after the giving of the guaranty, and, $1,000 only being paid thereon, was twice renewed for the balance of $44,000; the last renewal falling due April 16, 1901. On January 29, 1901, after the execution of the guaranty, the commission company borrowed $30,000 more from the bank, and executed its note therefor, maturing in 30 days, and pledged certain collateral for its payment. At the maturity of this note it was not paid, but renewed for another term of 30 days. On March 11, 1901, the commission company borrowed $30,000 more from the bank, and gave its note therefor, maturing about April 11, 1901, and also pledged certain collateral for its payment. Some time in April, 1901, the commission company failed, and on April 22d of that year, after crediting the company with the amounts collected on collateral pledged for the payment of the three notes, it was found that it owed the bank the aggregate sum of $59,204.19 and for this sum Swain, as treasurer of the company, executed its note (hereafter referred to as the note for $59,000) to the bank, payable in 30 days. Siegel had disappeared, and Rockefeller, at the instance of Swain, went to Kansas City, saw Dr. Woods, the president of the bank, and told him he intended to remain until the affairs could be straightened out, and assured him that his guaranty was good for any legal liability against him. Dr. Woods answered that the company owed the bank $59,204.19, represented by the consolidated note just mentioned, and that he felt safe because he had Rockefeller's guaranty back of it. Under the impression that all of the indebtedness of the company to the bank had been incurred since the execution of the written guaranty, and also that the bank held collateral security enough belonging to the company to fully pay the indebtedness, Rockefeller returned to Cleveland, and later was advised by the bank that it desired settlement of his obligation, and that unless settlement was speedily made it would be obliged to sell the collateral held by it. On August 10th Rockefeller returned to Kansas City, and, after settling other accounts not necessary now to be considered, took up the settlement of the $59,000 note, and found that it was entitled to credits arising from collections of collateral by the bank which reduced the amount due to $45,852.60. This was settled by Rockefeller paying $10,000 in cash and giving the $36,000 note in controversy for the balance. All the collateral which the commission company had pledged to secure the payment of its note for $59,000, which had not already been paid and credited upon the company's obligation to the bank, was allowed to stand as collateral security for the payment of Rockefeller's new note for $36,000, and was listed on the back of that note.

Rockefeller had never given personal attention to the details of the business of the commission company and knew little of its financial transactions. He intrusted such matters to his friend, Swain; but as trouble came his first impulse was to learn the amount of his obligation and have it settled as soon as possible. He seems to have taken the implications, if not the statements and representations, of the officers of the bank, to the effect that the entire amount of the $59,000 note fell under his guaranty, as true, and to have relied upon them without making any special examination of the books of the commission company or of the bank to inform himself independently concerning the matter. Some time after he had given the $36,000 note, and prior to its ma-

turity, his suspicions became aroused, and he ascertained as a result of considerable investigation that $44,000 of the first loan for $45,000 made by the bank to the commission company, less such collections of collateral pledged for its payment as had been made by the bank, had been embraced in the amount claimed to be guaranteed by him. He also learned that, after crediting the two notes of $30,000 given by the commission company to the bank with the net proceeds of collections of collateral properly pertaining to them, the total amount due on them on October 28, 1901, was only $10,811.09. This appears to have been stipulated as a fact in the progress of the trial below. Rockefeller then paid this sum to the bank and demanded the surrender of his $36,000 note of date August 16th, and this demand was refused by the bank. It results that, unless Rockefeller in some manner became liable for what remained unpaid on the first loan of $45,000 made before the written guaranty was executed, he had paid all he owed the bank by reason of his guaranty, and his note should be canceled.

O. H. Dean (Robinson, Carkener & Robinson, on the brief), for appellant.

Sanford B. Ladd (John C. Gage and Charles E. Small, on the brief), for appellee.

Before SANBORN and ADAMS, Circuit Judges, and RINER, District Judge.

ADAMS, Circuit Judge (after stating the facts as above). We think Rockefeller did not become liable for the $45,000 loan of January 9, 1901, by the terms of the guaranty afterwards signed by him. It is a rule of very general application that all guaranties are prospective and not retrospective in operation, unless the contrary appears by express words or by necessary implication. Brandt on Suretyship and Guaranty (3d Ed.) § 108; People v. Lee, 104 N. Y. 441, 449, 10 N. E. 884; Pritchett, Baugh & Co. v. Wilson, 39 Pa. 421. A most critical reading of the guaranty in question discloses no purpose, either express or implied, to give it any retrospective operation. It is couched in plain and simple language, and is an agreement on the part of the signers to guarantee all debts which the commission company may from time to time contract or may become liable for to the bank. These words, in our opinion, clearly look to the future and not to the past. Did either one or both of the renewal notes given for $44,000 of the original $45,000 loan, after the execution of the guaranty, amount to the contracting or becoming liable for a debt within the meaning of the written guaranty? We think not. There is nothing in this record showing that the renewal notes were intended to be given or received in actual payment of the original debt. They were clearly intended, not as payment or discharge of that debt, but as extensions of time for or postponement of its payment. The debt had already been contracted. The evidence of it only was changed. 2 Daniel on Neg. Inst. 1260; McLaughlin v. Bank of Potomac, 7 How. 220, 228, 12 L. Ed. 675; Jones v. Guarantee & Indemnity Co., 101 U. S. 622, 630, 25 L. Ed. 1030; Lee v. Hollister (D. C.) 5 Fed. 752, 757; Case v. Fant, 3 C. C. A. 418, 53 Fed. 41; Patterson v. Wade, 53 C. C. A. 1, 115 Fed. 770; Deseret National Bank v. Dinwoodey, 17 Utah, 43, 53 Pac. 215; National Bank v. Cramer, 78 Mo. App. 476, 481.

Was the original loan of $45,000 made pursuant to an oral agreement by Rockefeller to guarantee its payment or to execute a general

guaranty like that subsequently executed on January 21st? We think not. There is no claim that anything was said by Rockefeller to the officers of the bank at the time the loan was made, or that Rockefeller then had any knowledge of the transaction. Dr. Woods, the president, with the doubtful corroboration of one other witness, testified that some time in December, 1900, before the loan of $45,000 was made, and before the guaranty was executed, he had a conversation with Rockefeller, and that the latter said to him that "he had arranged to become connected with the Siegel-Sanders Live Stock Commission Company and made some inquiries about the business, also about Siegel. I told him that I thought Mr. Siegel was bright enough and smart enough, but that he was young and impulsive, and that our business relations with him had not been satisfactory. Mr. Rockefeller expressed a desire that the company should do business with us, giving us reasons for it, and said to me that he was going to give a guaranty to protect us," and Dr. Woods testified that he would not have loaned the company any money, but for that promise. This conversation is explicitly denied by Rockefeller; but, assuming it to be true as stated by Dr. Woods, it is manifestly an expression of an intention on Rockefeller's part to do something in the future. It does not purport to be a present promise, but only an expression of a revocable general purpose. The putting of his intention into effect seems also to have been conditioned upon his becoming at some time in the future connected with the company, and then, if at all, he was, according to the testimony, "going to give a guaranty." These words clearly imply no present accomplished act, but a future purpose to do something, which should not bind him till done.

This language is too vague and indefinite to constitute a present engagement of the importance now claimed for it. Moreover, the actual execution of the guaranty in writing soon thereafter elucidates the meaning of the alleged conversation. The giving of it was an act quite in harmony with Rockefeller's general purpose, foreshadowed only in the prior tentative conversation, and not at all in harmony with the present contention that he had already legally bound himself. This writing must be taken as the last and only expression of the intention of the parties, and in the absence of fraud, accident, or mistake must be conclusively presumed to express their whole engagement. It merged all former conversations and negotiations on the subject, and conclusively settled the rights of the parties to it. Bast v. Bank, 101 U. S. 93, 96, 25 L. Ed. 794; Union Selling Co. v. Jones, 63 C. C. A. 224, 128 Fed. 672; Connecticut Fire Ins. Co. v. Buchanan, 73 C. C. A. 111, 141 Fed. 877, 4 L. R. A. (N. S.) 758; Omaha Cooperage Co. v. Armour & Co. (C. C. A.) 170 Fed. 292. Assuming, then, that a parol promise to give a written guaranty would have rendered Rockefeller liable for a debt contracted thereafter, we conclude that such a promise is not established by the proof in this case.

It is further contended by the bank that the $36,000 note was given in settlement and adjustment of differences between the bank and Rockefeller, and that a consideration is thereby afforded for the whole

note; but we are unable to take this view of the matter. The note was given to evidence what was understood and believed at that time by Rockefeller to be a just liability against him on his guaranty. There was no dispute or difference concerning that liability, and no concession was asked for or made on account of any differences between the parties. The bank represented that the amount of the note embraced only the unpaid parts of loans made to the commission company covered by Rockefeller's guaranty, and Rockefeller, assuming that to be true, executed his note therefor, and that was all there was of the transaction. The giving of the note, in the most charitable aspect that can be taken of the facts, was the result of mutual mistake of the parties. A compromise of disputed claims is desirable, and in itself affords ample consideration for a promise to pay the amount agreed on. But obviously there must be disputed claims, and a conscious compromise of them, as the genesis of such a consideration. 1 Wharton on Law of Contracts. § 533; Northern Liberty Market Co. v. Kelly, 113 U. S. 199, 5 Sup. Ct. 122, 28 L. Ed. 948.

The bill predicates complainant's equitable right to the cancellation of the $36,000 note upon three grounds: (1) That the bank secured the execution of it by falsely representing to Rockefeller that the $59,000 note executed by the commission company to the bank, in settlement of which the note in question was given by Rockefeller, represented and embraced only loans which had been made to the commission company by the bank after the execution of the guaranty; (2) that the bank secured its execution by concealing the fact that the note for $59,000 actually embraced a part of the original $45,000 loan; and (3) that the note was without consideration, except as to the sum of about $10,000, which was paid by Rockefeller just before this suit was brought.

We cannot say, after a careful consideration of the proof, that there was any direct and intentional false representation or concealment by the bank, such as was charged in the bill; but, when it is considered that the bank had actual knowledge of the constituent loans that went to make up the $59,000 note, and necessarily knew that the unpaid portion of the original loan of $45,000 was included in it, and, with that knowledge, took the face of the $59,000 note, less what had been collected on the pledged collateral, as the measure of Rockefeller's liability on his guaranty, and presented to him, on the occasion of his going to Kansas City to settle that liability, a claim for the difference, amounting to $15,852.60, as the amount due from him on the guaranty, it, in effect, assured Rockefeller that the claim as presented was for money advanced on the strength of his guaranty. All parties agreed that Rockefeller's sole purpose in the interviews with the bank officials on this subject was to settle that liability. This misrepresentation may have been made under the mistaken belief that the guaranty in law covered the original loan of $45,000, as is now ably contended; but, however inspired, it constituted a substantial misrepresentation and concealment of facts which were within the knowledge of the bank, and not shown to have been within the knowledge of Rockefeller.

The third ground for equitable relief however is clear. It results,

from what we have said, that the $36,000 note now sought to be canceled, in so far as it embraced any part of the original $45,000 loan, was without consideration, and as between the parties to it its payment ought not to be enforced. We have already seen by the stipulation of the parties that it did embrace $25,417.96 of that loan. The payment, therefore, by Rockefeller to the bank of $10,811.09 immediately before the institution of this suit left nothing legally due on the $36,000 note; and the decree for its cancellation and surrender was right.

We now pass to a consideration of the errors assigned to that part of the decree directing the bank to assign and deliver to Rockefeller 10 certain promissory notes which had been pledged by the commission company, payee therein, as security for the payment of the two $30,000 notes, and subsequently carried forward in the pledge to secure the payment of the consolidated note of $59,000. These notes constituted all the collateral security which had been pledged for the payment of those two notes which remained uncollected at the time the decree was entered in this case. If these notes had been pledged as collateral security for the payment of those two notes only, the right of Rockefeller, upon paying them, to be subrogated to the rights of the pledgee, would seem to be unquestionable. But such is not the fact. The two notes each read as follows:

"Thirty days after date, for value received, we promise to pay to the order of the National Bank of Commerce of Kansas City, Mo., thirty thousand dollars, at the National Bank of Commerce, Kansas City, Mo., with interest from maturity until paid at the rate of eight per cent. per annum. To secure the payment of this note and of any and all other indebtedness which we now owe to said bank or may owe it any time before the payment of this note, we have hereto attached, as collateral security, the following notes: [describing them], all secured by chattel mortgages, and hereby authorize W. A. Rule [who was the cashier of the bank], or in case of his death, absence, or refusal to act, the then acting cashier of the said bank, on default in payment of this note, or any interest thereon, to sell said collateral or any part thereof, with or without notice, at public or private sale.

"[Signed] Siegel-Sanders Live S. Com. Co.,
"R. D. Swain, Treas."

We think the fair meaning of this pledge, giving force and effect to all its terms and provisions, is that the notes were pledged by the commission company primarily to secure the payment of the two $30,000 notes, and secondarily, but no less effectually, to secure the payment of any other indebtedness which the commission company might owe the bank at the maturity of those notes. This, we understand, is the way the parties in interest treated the pledges, and we also understand that financial institutions generally employ substantially the same language in their collateral notes, and apply the proceeds of the sale of the collateral first in satisfaction of the debt primarily secured, and the surplus, if any, in satisfaction of any other indebtedness then due. Inasmuch as it appears that there is other unpaid indebtedness of the commission company to the bank, we are of opinion that the learned trial court erred in holding that Rockefeller was subrogated to the rights of the bank with respect to the ten notes in question. We do not find anything in the stipulation of the parties, called to our attention by complainant's counsel, or elsewhere, which stands in the way of our recognition of the bank's right to these notes.

There is one other contention of defendant's learned counsel, which was not presented to the trial court, and which first made its appearance in a supplemental brief filed in this court on the day of the argument, and which for these reasons, counsel for complainant contend, cannot be considered here. This being an equity case, which is tried on appeal de novo, it is not necessary that every reason for or against a decretal order should have been presented to the trial court. If the pleadings warrant the contention, and if there be an assignment of error permitting consideration of it, it is our duty to take it up and decide it. The contention is that as the renewal notes for $44,000 of the original loan of $45,000 were executed after Rockefeller's guaranty was made, and as those renewal notes pledged notes of other persons as collateral security for their payment, and as the commission company by a writing signed by it on the back of those notes guaranteed their payment, this last-mentioned guaranty was in itself a debt which the commission company contracted or became liable for to the bank after the guaranty of January 31st was executed. and that Rockefeller was by the terms of his guaranty obligated for it.

There are several valid reasons why this contention cannot be sustained. In the first place, it is foreign to the pleadings in the case. Defendant in its answer justified its retention of the $36,000 note because the original $45,000 note or its renewal, a part of which was embraced in the $36,000 note, was a debt of the commission company which was guaranteed by Rockefeller. The battle below was waged exclusively on this issue and on the grounds which have already been considered. Neither the pleadings nor the assignments of error remotely suggest that any part or portion of the consideration of the $36,000 note rested in the guaranty of Rockefeller of the guaranty made by the commission company of the payment of the collateral pledged to secure the payment of the $45,000 note. Moreover, the only proof found in the record justifying the contention were two unauthenticated exhibits, purporting to be copies of notes which are found, by tracing them back, to have been pledged for the payment of one of the $30,000 notes executed after the date of Rockefeller's guaranty, and not to have been pledged for the payment of the original $45,000 debt, or any part of it, and what purports to be a guaranty of their payment by the commission company indorsed upon them. Whether these two notes ever became an enforceable obligation or a debt of the commission company does not appear. From the proof it would be impossible to find facts requisite to support the defendant's present contention.

Moreover, the contention that Rockefeller's contract of guaranty is elastic, and comprehensive enough to cover the commission company's guaranty of the payment of notes which it pledged as collateral for the payment of a debt which was not covered by his guaranty is too subtle to be sound. The parties to this plain and simple contract never could have reasonably contemplated any liability brought about by this circuitous process. Rockefeller's guaranty was for the payment of debts which the commission company might contract or become liable for. The commission company's guaranty of the col-

lateral did not constitute a debt. It was an executory contract only. It might or might not ripen into a debt. Unlike a surety, which becomes at once liable unconditionally as an original promisor with his principal for a debt, a guarantor becomes liable only in the event of default by the principal, and his liability does not generally attach unless the creditor gives him reasonable notice of the default of the principal, or unless due diligence is exercised to collect from the principal. 1 Brandt on Suretyship and Guaranty, § 2, and cases cited. In other words, the contracting of a debt is a single act, resulting in an immediate and unconditional obligation, while the contract of guaranty is complicated, and subject to many conditions which may defeat its enforcement. Obviously a guaranty of a debt is one thing, and the guaranty of a guaranty is another thing. A contract of the former kind only cannot be so construed as to cover the obligation which would be undertaken by a contract of the latter kind. The contracts of a guarantor are strictissimi juris, and unless a given transaction is brought clearly within the obligation of the guarantor no liability is incurred.

It results that the decree of the Circuit Court requiring the bank to surrender and deliver to Rockefeller the 10 notes described therein, with the chattel mortgages securing their payment, was erroneous, that the decree should be modified by eliminating that requirement, and that in all other respects it should be affirmed. The cause is therefore remanded to the Circuit Court, with directions to make the required modification, and, as so modified, the judgment will stand affirmed. The costs of this appeal should be equally divided between the parties.