INTERNATIONAL MULTIFOODS COR-
PORATION, a corporation, Plaintiff,

v.

D & M FEED & PRODUCE, INC., a corporation, Roger Moerer, Jo Ann Moerer and H. Elmer Meyer, Defendants.

Civ. No. 78–0–215.

United States District Court,
D. Nebraska.

May 15, 1979.

Thomas F. Hoarty, Jr., Omaha, Neb., for plaintiff.

James B. Cavanagh, Omaha, Neb., for defendants, D & M Feed, Roger Moerer and Jo Ann Moerer.

Kirk S. Blecha, Omaha, Neb., for defendant, H. Elmer Meyer.

## MEMORANDUM

DENNEY, District Judge.

This is an action brought by International Multifoods Corporation [hereinafter referred to as Multifoods] to recover certain sums of money due from D & M Feed & Produce, Inc. [hereinafter referred to as D & M] on open account and on two promissory notes, from Roger and Jo Ann Moerer [hereinafter referred to as the Moerers] on one of the promissory notes and on a guar-

anty of D & M's indebtedness, and from H. Elmer Meyer on a guaranty of Roger Moerer's indebtedness.

The matter was tried to the Court sitting without a jury. This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

### Background

On September 20, 1973, D & M and the Moerers executed their promissory note [Plaintiff's Exhibit # 1] to Multifoods, upon which $3,500.00, plus interest, is now due and unpaid. That same day, the Moerers executed their personal guaranty [Plaintiff's Exhibit # 2] of D & M's indebtedness to Multifoods. Subsequently, on April 6, 1976, H. Elmer Meyer executed his personal guaranty [Plaintiff's Exhibit # 3] of Roger Moerer's indebtedness to Multifoods. Thereafter, on April 20, 1976, D & M executed and delivered to Multifoods a promissory note [Plaintiff's Exhibit # 4] upon which the sum of $35,000.00 is now due and unpaid. When D & M ceased operations, it had an open account balance since April of 1976, with Multifoods in the amount of $14,-564.13 [Plaintiff's Exhibit #'s 5, 6, 7], which amount is presently due and unpaid.

The defendants do not contest the fact that these amounts are due and owing. Nor do they contest the execution of these documents. However, they do dispute the legal effect of the documents.

### The 1973 Guaranty

Plaintiff's Exhibit # 2, executed by the Moerers on September 20, 1973, states in pertinent part as follows:

In consideration of credit to be extended by INTERNATIONAL MULTIFOODS CORPORATION, 1200 Multifoods Building, Minneapolis, Minnesota 55402 ("IM") to D & M Feed & Produce, Inc., Auburn, Nebraska ("Debtor") the undersigned jointly and severally guarantee to IM the prompt payment at maturity, without deduction for any claim of setoff or counterclaim of Debtor or loss of contribution from any other guarantors, the full amount of all indebtedness, direct or indirect, absolute or contingent, secured or unsecured, which may now or hereafter exist or be owing from Debtor to IM, including interest thereof and any expenses of collection thereof, including court costs and attorneys' fees.

The plaintiff contends that it is clearly evident from the face of the guaranty, that the document covers "all indebtedness" of D & M, both then owing and thereafter incurred. The Moerers take the position that their guaranty covered only the $10,-000.00 promissory note executed the same day. Thus, the Court must determine the extent of the Moerers' liability by virtue of the execution of their guaranty on September 20, 1973.

At trial, the Moerers attempted to introduce various exhibits to explain the import of the guaranty and demonstrate that it was limited to the $10,000.00 note. Plaintiff objected to the introduction of this evidence, contending that such evidence varied the express terms of the guaranty, and was inadmissible because of the parol evidence rule. Crucial to the determination of this issue, therefore, lies in a consideration of the parol evidence rule.

The well-established general rule is that where the parties to a contract have deliberately put their engagement in writing in such terms as import a legal obligation without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the entire engagement of the parties, and the extent and manner of their undertaking, have been reduced to writing, and all parol evidence of prior or contemporaneous conversations or declarations tending to substitute a new and different contract for the one evidenced by the writing is incompetent. *Ford v. Luria Steel & Trading Corp.*, 192 F.2d 880, 883–84 (8th Cir. 1952); *Burhoop v. Pegram*, 194 Neb. 606, 612, 234 N.W.2d 828, 832 (1975). In the absence of fraud, mistake or ambiguity, the writing itself is the only competent evidence of the agreement.

*Frank McGill, Inc. v. Nucor Corp.*, 195 Neb. 448, 453–54, 238 N.W.2d 894, 899 (1976).

▮ Before the parol evidence rule comes into play, the writing must be examined to determine whether it is a complete expression of the agreement. *Gerdes v. Omaha Home for Boys*, 166 Neb. 574, 582, 89 N.W.2d 849, 854–55 (1958); *see also Traudt v. Nebraska Public Power Dist.*, 197 Neb. 765, 769, 251 N.W.2d 148, 151 (1977). A review of the guaranty clearly shows that it imports a complete legal obligation without any uncertainty as to the object or extent of the engagement. Thus, the parol evidence rule is applicable to the subject matter of this action.

The Moerers offered the extrinsic evidence in an attempt to show that their guaranty was intended to be confined to the $10,000.00 note. However, the guaranty clearly covers "*all* indebtedness . . . which may *now or hereafter exist or be owing*" from D & M to Multifoods. It is unambiguous and certain as to its object and extent. Clearly, the extrinsic evidence attempts to vary or add to the express language of the document. Consequently, in accordance with the parol evidence rule, the evidence is inadmissible. " '[P]arol evidence cannot be admitted to add another term to the agreement, although the writing contains nothing on the particular feature to which the parol evidence is directed'." *Bitler v. Terri Lee, Inc.*, 163 Neb. 833, 841, 81 N.W.2d 318, 323 (1957).

The Moerers do not seriously dispute the complete and unambiguous nature of the guaranty. Instead, they take the position, in reliance on the decision in *First Trust Co. v. Airedale Ranch & Cattle Co.*, 136 Neb. 521, 286 N.W. 766 (1939), that "when a guarantee is executed contemporaneously with other documents, it must be viewed as a single transaction and the documents must be construed together." [Final Argument of the defendants, Roger and Jo Ann Moerer at 2].

In *Gerdes v. Omaha Home for Boys, supra*, the Nebraska Supreme Court was faced with a similar contention and wrote as follows:

Appellants speak of interpreting contemporaneous instruments as though they were one. The correct doctrine in this regard means that if there is a provision in one instrument affecting a provision of another, they will be given effect as between the parties and all who are charged with notice so that the whole agreement actually made may be determined and effectuated. It does not mean that a provision of one document is imported bodily into another contrary to the intent of the parties or the express provision of the latter. They may be intended to be separate writings though made at the identical time by the same parties and to provide for entirely different things. The statement that contemporaneous instruments may be treated and interpreted as one means only that this will be done when it will effectuate the intention and if the provisions of the two instruments if put together will not be incompatible. The court may not do violence to a complete, unambiguous contract by consolidating it with another writing if the effect of doing so would be to avoid an essential part of the contract. If contracts or writings are in effect independent they should not be construed together even though the same parties and the same subject matter may be concerned. Two instruments relating to distinct subjects or things should not be construed together to determine the intent and transaction of the parties though made at the same time and though they relate to the same transaction because both must have the same object in order to be taken together as evidencing the same thing. *Gerdes v. Omaha Home for Boys, supra*, 166 Neb. at 585–86, 89 N.W.2d at 856.

Applying the reasoning of the court in *Gerdes*, it is clear that *First Trust Co.* is inapposite. In *First Trust Co.*, as security for a loan, the defendants executed bonds, a real estate mortgage and a guaranty, all on the same date. The guaranty *specifically referred to* the loan involved and the real estate mortgage constituting the primary security. Thus, in *First Trust Co.*, the court

did not construe a broad guaranty to be confined to a particular transaction; rather, it was presented at the outset with a very limited guaranty.

In the present case, there is no reference in the guaranty to the promissory notes or to any other documents. The guaranty is incompatible with the other documents. Its object is different and it provides for different things. As the Court noted earlier, the language of the guaranty clearly includes items beyond the $10,000.00 promissory note and broadly extends the obligations of the guarantor. *See, e. g., Associates Fin. Services Co. v. Eisenberg,* 51 Wis.2d 85, 186 N.W.2d 272 (1971). This Court will not "do violence" to a complete and unambiguous document by construing it with other incompatible and distinct documents. *See Gerdes v. Omaha Home for Boys, supra,* 166 Neb. at 585–87, 89 N.W.2d at 856–57.

Moreover, assuming *arguendo* that the testimony and exhibits presented by the Moerers are admissible for some purpose, the evidence indicates that the guaranty was not intended to be limited to the $10,-000.00 note.

Significantly, the promissory note was co-signed by Roger and Jo Ann Moerer, thereby establishing their personal liability for the debt, irrespective of the guaranty. It was therefore unnecessary for the lender to additionally require a personal guaranty for only that debt. To limit the guaranty to the contemporaneous loan would make it superfluous because Moerer was liable on that loan as co-signer of the promissory note.

In addition, the facts show that on September 20, 1973, D & M owed Multifoods on unsecured open account approximately $31,-000.00, although D & M's credit limit was only $10,000.00. Testimony from Mr. Keith Johnson, a Multifoods representative, indicated that the collection of this account was a frequent topic of discussion with Roger Moerer several months prior to September, 1973, and Johnson also testified that the execution of the guaranty was required by Multifoods as part of an effort by Multi-

foods to strengthen its entire credit position with D & M, in order that the two companies might continue to do business.

Some of the documents offered by the Moerers do refer to the guaranty as security for the $10,000.00 loan, and indeed it was, since this loan was a debt of D & M to Multifoods, and the guaranty covered *all* debts of D & M to Multifoods. Multifoods also took security interests in other assets of D & M besides the new equipment purchased with the $10,000.00 capital loan. Thus, the Moerer guaranty was part of an effort by Multifoods to strengthen its overall credit position so that it could continue selling to D & M on open account.

The Court also notes that Roger Moerer's reactions and responses when he was confronted in 1976 by Multifoods' representative, Mr. Michael McCurdy, concerning the personal guaranty, do not show any sentiment on Moerer's part that the guaranty was confined to the $10,000.00 promissory note. According to McCurdy, when confronted with a demand for personal payment based on this guaranty, Moerer first was silent and then said, "What do we need to do to get this taken care of; what can we do?" Moerer's version differed somewhat; at one point, he was asked if he ever admitted personally guaranteeing D & M's open account, and he stated: "Not until I saw the papers." Later, he was asked if he ever admitted or denied personally guaranteeing the open account and he said, "No." While there may be some conflict between the recollections of McCurdy and Moerer on this point, it is clear that Moerer never then took the position that his guaranty was limited to the $10,000.00 note. Further, on April 6, 1976, at Mr. Meyer's place of business, Moerer listened to McCurdy tell Meyer that Moerer had personally guaranteed D & M's open account to Multifoods, and Moerer stood by silently while Meyer signed Plaintiff's Exhibit # 3, guaranteeing Moerer's debts to Multifoods.

Thus, even assuming that the exhibits and testimony are competent, it is clear that the totality of the evidence shows that Moerer knowingly executed a valid and

binding guaranty of all indebtedness, both then owed and thereafter incurred by D & M.

### The 1976 Guaranty

At trial, there was undisputed testimony regarding the execution of the April 6, 1976, guaranty by H. Elmer Meyer:

1. In the spring of 1976, D & M owed Multifoods approximately $48,000.00 (including both an open account balance and the balance due on the September 20, 1973, note);

2. In the spring of 1976, Multifoods, through McCurdy, made demand upon Roger Moerer for payment of this amount under the September 20, guaranty;

3. A "set aside" arrangement was worked out between McCurdy and Moerer for deferred payment of the $48,000.00 plus additional credit of $20,000.00 if Moerer's father-in-law, H. Elmer Meyer, would guarantee the debt;

4. A guaranty was signed on April 6, 1976, by Meyer at his office, with Meyer, Moerer and McCurdy in attendance;

5. Thereafter, additional open account credit was extended to D & M and the prior open account balance was converted to a deferred-payment promissory note.

The Meyer guaranty of April 6, 1976, reads in pertinent part as follows:

In consideration of credit to be extended by INTERNATIONAL MULTI-FOODS CORPORATION, 1200 Multifoods Building, Minneapolis, Minnesota 55402 ("IM") to Roger E. Moerer ("Debtor") the undersigned jointly and severally guarantee to IM the prompt payment at maturity, without deduction for any claim of setoff or counterclaim of Debtor or loss of contribution from any other guarantors, the full amount of all indebtedness, direct or indirect, absolute of (sic) contingent, secured or unsecured, which may now or hereafter exist or be owing from Debtor to IM, including interest thereon and any expenses of collection thereof, including court costs and attorneys' fees.

Multifoods takes the position that the Meyer guaranty renders Meyer liable not only for the indebtedness of Moerer to Multifoods, but also makes Meyer liable for the guaranty of Moerer to Multifoods. Meyer's main contention is that the document makes him liable only for the indebtedness of Moerer to Multifoods and does not make him a guarantor of Moerer's guaranty. In support, Meyer places reliance on the parol evidence rule, discussed earlier by the Court. He contends that the meaning of his guaranty is clear and unambiguous; that Meyer guaranteed only the debts of Moerer and he did not guarantee the guaranty of Moerer.

Meyer cites to various cases in support of his position that he did not guarantee the guaranty of Roger Moerer. *National Bank of Commerce v. Rockefeller*, 174 F. 22 (8th Cir. 1909); *Rohn v. Weld County Bank*, 155 Colo. 490, 395 P.2d 1003 (Colo.1964); *Trego Wakeeney Bank v. Maier*, 214 Kan. 169, 519 P.2d 743 (1974). However, an examination of both the guaranty language and the facts in each of these cases demonstrates that they are materially different from the present case in each respect.

In *Trego*, the guaranty stated that it covered four specific types of primary debts and a fifth general class of "any and all other obligations" of the debtor. The Supreme Court of Kansas, applying the doctrine of *ejusden generis*, held that by enumerating four specific types of primary indebtedness, the guaranty impliedly excluded any secondary indebtedness, such as a guaranty. *Trego Wakeeney State Bank v. Maier, supra*, 519 P.2d at 748.

In *Rohn*, a wife signed a guaranty to the bank covering "obligations and notes" of her husband, who himself had guaranteed their son's line of credit to the same bank. The Supreme Court of Oregon held that the terms of the wife's guaranty were confined to the debts arising out of credit extended to her husband and could not be extended to the son's debts. The court also applied the doctrine of *ejusden generis* and found that the word "obligation" only referred to the type of obligations particularly describ-

ed in the guaranty. *Rohn v. Weld County Bank, supra,* 395 P.2d at 1005.

In *Rockefeller,* a shareholder-director gave a written guaranty of a corporation's debts. The guaranty made no mention of covering debts incurred prior to the date of its execution. The bank attempted to bring such prior debts within the guaranty by showing that the corporation later endorsed its own guaranty upon notes pledged as collateral for the prior debt. However, the Eighth Circuit held that since the guaranty contract did not in plain language refer to the past indebtedness, it should be construed to embrace only future obligations. *National Bank of Commerce v. Rockefeller,* 174 F. at 25–26. The Court also found that the defendant's guaranty was confined to the debts of the corporation and, since the corporation's guaranty merely created a contingent liability and was not a debt, it was not included within the limited scope of the defendant's guaranty. *National Bank of Commerce v. Rockefeller, supra,* 174 F. at 29.

■■ By contrast, in view of the broad and unlimited language of the April 6, 1976, guaranty, Meyer's argument must fail. "[A]ll indebtedness" of Roger Moerer, "direct or indirect, absolute or contingent" is included within Meyer's promise to pay. There was no such language or any similar language in *Trego, Rohn* or *Rockefeller.*

There was no enumeration of specific obligations which restricted the scope of the Meyer guaranty. *See, e. g., Fannin State Bank v. Grossman,* 30 Ill.App.2d 484, 175 N.E.2d 268 (1961); *see generally* 85 A.L. R.2d 1183 (1962).[1] Clearly, the liability of Moerer as guarantor of D & M's debts is indirect and contingent. He is indirectly responsible as guarantor for the debts of D & M and this responsibility is contingent upon D & M's failing to pay when due. Meyer's argument would strip these terms of their meaning. Yet, it is well settled that every provision in a guaranty agreement must be given meaning by the Court, if possible. *Custom Leasing, Inc. v. Carlson Stapler & Shipper's Supply, Inc.,* 195 Neb. 292, 297, 237 N.W.2d 645, 648 (1976); *see also Laurentide Finance Corp. v. Capitol Prod. Corp.,* 392 F.2d 444, 447 (3rd Cir. 1968).

Therefore, the Court is of the opinion that it is clear from the language of the Meyer guaranty that the parties intended the guaranty to cover the secondary liability or contingent liability of Roger Moerer, as well as his primary liability. Meyer did not limit his undertaking to Moerer's debts. He expressly included a promise to pay the contingent liabilities of Roger Moerer. *See, e. g., Bank of America Nat. Trust & Sav. Ass'n v. Burhans,* 265 Wis. 108, 60 N.W.2d 725 (1953).[2]

1. The Annotation deals essentially with the same issue as is involved herein, and begins the discussion stating that:

> . . . it is generally held that a contract to pay the debts or obligations of another, which does not specify the nature of such debts or obligations, covers the principal debtor's liability as an endorser or guarantor of a negotiable instrument, as well as his primary liability.

85 A.L.R.2d 1178, 1183.

2. The Court believes that the events of this case seem to disclose yet another reason why the amounts sought by Multifoods are within the express language of the Meyer guaranty. The Court notes that it is undisputed that various sums of money are owed by D & M to Multifoods, that demand has been made and that the money is presently due and unpaid. [See Plaintiff's Exhibit # 7]. Therefore, seemingly, the Moerers' liability which was contingent, became absolute by virtue of D & M's

failure upon demand to pay its debts. In other words, the Moerers' obligation became fixed by the occurrence of these events, and the outstanding accounts and notes became the obligations of the Moerers due to the latters' unequivocal promise to pay them. They were no longer only the debts of D & M, but were the Moerers' own debts. *See Bank of America Nat. Trust & Sav. Ass'n v. Burhans, supra,* 265 Wis. at 110–112, 60 N.W.2d at 727–28. Seemingly, the Meyer guaranty which covers "all indebtedness . . . absolute or contingent" would include those debts which are now the debts of the Moerers, the contingency having occurred.

Moreover, the Court notes that in *Rockefeller,* aside from the guaranty being confined to the debts of the corporation, the contingency upon which the corporation's guaranty depended had not yet occurred. Thus, the liability was still contingent and could not be included within a guaranty confined to the debts of the corporation.

At trial, certain testimony was elicited from Meyer, apparently to show that he did not understand the document he had signed. The Court notes that the record is devoid of any fraud, trickery, deceit, misrepresentation or undue influence on behalf of Multifoods.

■ Under Nebraska law, it has been held that in the absence of fraud a person signing an agreement cannot avoid its effect by asserting he did not read it, *General Acceptance Corp. v. Blanco*, 181 Neb. 562, 149 N.W.2d 516 (1967), or by claiming that he was not informed of its contents, *Musser v. Zurcher*, 180 Neb. 882, 146 N.W.2d 559 (1966), or by claiming that he was unlearned and ignorant of legal proceedings. *Meyer v. Schmidt*, 135 Neb. 850, 284 N.W. 337 (1939). Other jurisdictions have held that the failure of the guarantor to understand the legal significance of a guaranty, *Azrak v. Manufacturers Trust Co.*, Sup., 120 N.Y.S.2d 855 (1953), or the guarantor's ignorance of the contents of the guaranty, *International Text-Book Co. v. Mabbott*, 159 Wis. 423, 150 N.W. 429 (1915), does not relieve him of the guaranty's obligations.

Moreover, the facts of the present case do not support Meyer's contentions. Meyer is hardly unlearned or ignorant. He was a high school graduate, and had farmed for at least fifteen years. He ran a grain elevator by himself for over twenty years prior to the time the document was signed. By 1976, the elevator transacted $1,000,000.00 of business annually, and Meyer testified that he handled all the financial dealings for the business.

Meyer's testimony indicates that the guaranty was thrust at him unexpectedly, that his meeting with McCurdy was very short, that he glanced at the guaranty, and stated that he did not understand it, received no explanation of it, but signed the guaranty anyway. However, at trial, additional facts were brought out which indicate that the transaction was more complete.

The document consists of one page. It is straightforward and unambiguous. Meyer had co-signed promissory notes for Roger Moerer annually at a bank in Johnson, Nebraska. Thus, he had personally backed Roger Moerer on other occasions and was not unfamiliar with the procedure.

McCurdy testified that the meeting lasted about two hours. Moerer and Meyer testified that it lasted fifteen to twenty minutes or maybe half an hour. Yet, Meyer, in his deposition, admitted that it took at least one hour.

Meyer testified that he only glanced at the document. However, in his deposition he admitted that he had in fact read it.

Meyer claimed that after he glanced at the guaranty he stated he did not understand it, and that McCurdy gave no explanation. However, Roger Moerer, on cross-examination, testified after Meyer that McCurdy explained that "this was to back me, Roger Moerer, and was to cover the open account I had, and was also to give me some working capital." McCurdy testified that he explained to Meyer that about $48,000.00 was owed by D & M to Multifoods, that the Moerers had personally guaranteed this amount, and that Multifoods was willing to defer immediate payment and was willing to extend further credit if Meyer signed the guaranty.

While Meyer first testified that no other documents were shown to him by McCurdy at the meeting, he admitted in his deposition that account summaries or ledgers were shown to him. At one point in his cross-examination, Meyer stated that he could not remember what had happened that day.

Finally, Meyer testified that no dollar figures were mentioned to him at the meeting. Later, he testified that he remembered a floor of $20,000.00 being explained to him and that when Moerer got down to that, Meyer would be relieved. After being shown another part of his deposition, Meyer admitted remembering the figure of $35,000.00 being discussed as the amount of the debt.

In sum, it is clear that Meyer knew exactly what he was doing on April 6, 1976, the day he signed his guaranty. He knew

Moerer was in financial trouble; he knew the general amount of the money involved; and he knew that he was being asked to give his personal financial backing to his son-in-law. He had every opportunity to ask questions regarding the document, to refuse to sign the document, or to seek the advice of another. He chose not to do so.

An order shall issue contemporaneously with this Memorandum Opinion.