### THE COCA–COLA BOTTLING CO. v. THE COCA–COLA CO.

(District Court, D. Delaware. November 8, 1920.)

No. 389.

1. **Evidence ☞397(2)—Antecedent negotiations inadmissible to vary contracts.**

   Persons who put their contracts in writing must, in the absence of fraud, accident, or mistake, be taken to have embodied their whole engagement therein, so that its terms may not be varied or controlled by antecedent negotiations or declarations.

2. **Contracts ☞169—Construed in light of conditions to give effect to intention of parties.**

   The court, in ascertaining and giving effect to the mutual intentions of the parties as expressed in a written contract, may, and should so far as possible, put itself in the position of the parties to the contract and examine into the circumstances under which it was made.

3. **Contracts ☞147(3)—Construed as a whole.**

   The intentions of the parties as expressed in the contract must be ascertained from the agreement as a whole, and from all its terms considered together, since the entire intention of the parties was not expressed in any one clause.

**4. Contracts ⬥143—Meaning not to be defeated by construction to accomplish good.**

In construing contracts, the court must be on guard lest under the guise of construction to bring about some ultimate good, or to thwart an apparent wrong, or prevent hardship, a contract different from that made by the parties be built up.

**5. Property ⬥2—Sales ⬥10—Secret process is salable property.**

A secret process or formula for the manufacture of an article is one in which property rights can exist, and such rights can be sold in whole or in part, so long as the process remains valuable because it is secret.

**6. Contracts ⬥118—Covenant not to use secret process sold is valid.**

A sale of an interest in a secret process may be accompanied by a covenant that the seller will not thereafter use the process or communicate it to any other person, and such covenant is valid and binding.

**7. Good will ⬥5—Is salable property.**

The good will of a corporation engaged in the manufacture of a particular article is property, which may be bought and sold in connection with the business as an incident thereof.

**8. Trade-marks and trade-names ⬥33—Trade-mark is property right, salable with business.**

The right to a trade-mark is a property right, which may be sold in connection with the good will of a business, since it is the symbol of part or all of the good will; but it cannot be sold wholly dissociated from the business or merchandise with which it has become established.

**9. Trade-marks and trade-names ⬥33—Trade-mark assignable between manufacturer and retailer.**

The trade-mark of retailer may be assigned by him to the manufacturer, who makes the goods which he sold under that trade-mark; likewise the manufacturer of goods may assign his trade-mark to one who sells the goods for him.

**10. Trade-marks and trade-names ⬥33—Owner of potential business may transfer it with trade-mark.**

A manufacturer of syrup, which had theretofore been used only for the making of drinks at soda fountains, in connection with which its trade-mark had acquired a well-established meaning, has a potential business for the bottling of such syrup with carbonated waters, and sale thereof under the trade-mark, which it can transfer to another in connection with an interest in the trade-mark, though it had never yet engaged in such business.

**11. Trade-marks and trade-names ⬥35—Contract held to transfer interest in trade-mark to business to be established.**

In a contract whereby the manufacturer of a syrup for soda fountain drinks granted the exclusive right to bottle and sell beverages under its trade-mark within a specified territory to a corporation, which agreed to establish a bottling plant sufficient to meet demand for the product in the specified territory, and to purchase syrup for such drink from the manufacturer, who agreed to sell syrup for bottling purposes only to the bottling company within that territory, neither the conveyance of the interest in the trade-mark nor the provisions for the sale of the syrup form the controlling feature to which the others are incidental, but the contract as a whole transfers to the bottling company the potential business which the manufacturer had never developed of bottling its syrup for the trade, and all the provisions of the contract are adapted to carry out this intention.

**12. Good will ⬥5—Transfer of good will held valid.**

A manufacturer of syrup for soda fountain drinks, who had acquired a good will by reason of the public demand for that drink, can transfer an interest in such good will to a company which bottles the syrup and

---

carbonated waters for sale under the trade-mark of the syrup manu-
facturer, since the favor which the fountain drink had acquired with
the public would inure to the benefit of the bottled drink.

13. Trade-marks and trade-names ⊕⊷33—"Grant" of interest in trade-mark
to new business is not in gross.

In a contract between a manufacturer of syrup for beverage flavoring
and a bottling company, a grant by the manufacturer of the exclusive
right to the bottling company to use the manufacturer's trade-mark in
connection with bottled goods within restricted territory denotes a trans-
fer of property, and such transfer of interest in the trade-mark is not in-
valid as a transfer in gross, though the potential business of bottling the
beverage had never been developed by the manufacturer.

[Ed. Note.—For other definitions, see Words and Phrases, First and
Second Series, Grant.]

14. Contracts ⊕⊷10(4)—Agreement to sell syrup held not to lack mutuality;
"consideration."

In a contract whereby one party agreed to establish plants for the
bottling of the syrup manufactured by the other party as a carbonated
beverage, the promise of the manufacturer to sell the syrup at a stipulated
price was not given alone in return for the agreement to buy at that
price, which stated no quantity, so as to be void for want of mutuality,
but was supported also by the agreement of the bottling company to
establish plants, which it had performed, even though the title to those
plants was retained by the bottling company, since the consideration is
the matter of inducement to a contract whether it be the compensation
which is paid, or the inconvenience which is suffered by the party from
whom it proceeds.

[Ed. Note.—For other definitions, see Words and Phrases, First and
Second Series, Consideration.]

15. Sales ⊕⊷1(4)—Agreement to sell quantity required by buyer's business is
sufficiently certain.

An agreement by a manufacturer of flavoring syrup to sell to a bottling
company, which had agreed to establish sufficient plants to supply the
demand for the beverage within its territory, all the syrup which was
required by the bottling company for its business, is not invalid for un-
certainty as to subject-matter.

16. Sales ⊕⊷84—Agreement to sell syrup for bottling under trade-mark held
perpetual.

An agreement by a manufacturer of syrup to sell the syrup required by
bottling company's business contained in a written contract, which trans-
ferred an interest in the manufacturer's trade-mark and good will to the
bottling company, which agreed to establish plants sufficient to supply
the trade in its territory, is a perpetual agreement, which continues so
long as the rights with which it was transferred continue, and is there-
fore not void for uncertainty as to the time, or terminable at the will of
the bottling company.

17. Monopolies ⊕⊷17(2)—Contract for exclusive right to bottle syrup held not
illegal.

The contract whereby a manufacturer of flavoring syrup transferred
its potential business of bottling such syrup with carbonated water for a
beverage to a bottling company, to which it gave the exclusive right to
bottle and sell under its trade-mark in a territory covering a large portion
of the country, and whom it required to agree not to purchase its syrup
from any other person, is not void as a monopoly under the law of Georgia,
the Sherman Anti-Trust Act, or the Clayton Act, since its purpose was
not to effect a merger or consolidation of businesses theretofore existing
in severalty, but was to sever the bottling business from the business of
supplying soda fountains, which were competing businesses, and the re-
strictions imposed in the contract were reasonable business regulations.

**18. Courts ⊜343—Subcontractors of complainant were persons with interest in subject-matter, and authorized to intervene to protect original contract.**

In a suit by a bottling company to prevent the cancellation of its contract with the manufacturer, who furnished syrup for bottling, the subcontractors of bottling rights under the complainant were persons having an interest in the subject-matter of the action, within equity rule 37 (198 Fed. xxviii, 115 C. C. A. xxviii), and might have joined as plaintiffs in obtaining the relief demanded, and therefore can be permitted to intervene and seek the same relief as the original complainant, and, having done so, the defendant cannot object that complainant is not entitled to relief, because he had transferred his rights to the subcontractors.

In Equity. Suit by The Coco-Cola Bottling Company against The Coco-Cola Company. Hearing on motion by defendant to dismiss the bill and by the complainant for a temporary injunction. Motion to dismiss the bill denied, and decree for preliminary injunction ordered.

H. H. Ward, of Wilmington, Del., John A. Sibley and Charles T. Hopkins, both of Atlanta, Ga., and Frank Spurlock and James B. Sizer, both of Chattanooga, Tenn., for complainant.

William S. Hilles and Robert H. Richards, both of Wilmington, Del., Samuel B. Adams, of Savannah, Ga., and Clifford L. Anderson and Robert C. Alston, both of Atlanta, Ga., for defendant.

MORRIS, District Judge. The defendant, The Coca-Cola Company, a Delaware corporation, taking the position that a contract made between The Coca-Cola Company, a Georgia corporation predecessor in title of the defendant, of the one part, and J. B. Whitehead and B. F. Thomas, through whom complainant claims, of the other part, was a contract at will, with the right in either party to terminate the same upon reasonable notice, gave notice to the complainant that the contract would "stand terminated" on a specified subsequent day. Thereupon the complainant, denying the contract to be terminable at the will of either party without the consent of the other, filed its bill of complaint, praying for an injunction, a decree for specific performance, and other and general relief. The case is now before the court upon defendant's motion to dismiss the bill, under equity rule 29, and also upon complainant's motion for a preliminary injunction as prayed by the bill. The defendant's motion will be first considered, and, as it must be disposed of solely upon the allegations of the bill, the substance of such allegations, so far as deemed material to a proper consideration of this motion, will be stated.

The Georgia corporation was organized in 1892, and became the sole owner of a secret process or formula under which it manufactured from the time of its organization until the year 1919 a syrup used in making a drink which it called Coca-Cola. It also adopted and used the words "Coca-Cola" as a common-law trade-mark. By the year 1899 the Georgia corporation had become solely entitled to use the trade-name and trade-mark "Coca-Cola." Until the latter year the syrup manufactured by it had been used only as the base for a drink served at soda fountains for immediate consumption. During that

year a contract was made between J. B. Whitehead and B. F. Thomas, of the first part, and the Georgia corporation, of the second part, which, as amended shortly after its execution, reads (with the exception of the numbers preceding each paragraph, here added for convenience of reference), so far as material to the issues raised by the pending motions, as follows:

"Georgia, Fulton County.

"This agreement, made and executed in duplicate this the twenty-first day of July, 1899, between J. B. Whitehead and B. F. Thomas, of the first part, and The Coca-Cola Company, of the second part, witnesseth:

"(1) That the parties of the first part are to establish in the city of Atlanta, as soon as the necessary machinery and buildings can be obtained, a bottling plant for the purpose of bottling a mixture of Coca-Cola syrup and preparation with carbonic acid and water.

"(2) This plant to be established by said parties of the first part without any expense or liability of any sort against said party of the second part.

"(3) Said parties of the first part further agree to prepare and put up in bottles or other receptacles, a carbonated drink containing a mixture of the Coca-Cola syrup and water charged with carbonic acid gas under a pressure of more than one atmosphere. Said Coca-Cola syrup and said water in said mixture to be used in proportions of not less than one ounce of syrup to eight ounces of water.

"(4) Said parties of the first part further agree to put up and keep and cause to be kept in sufficient quantity to supply the demand in all territory embraced in this agreement, a supply of this carbonated drink. It is expressly agreed that if, receiving notice in writing from the said party of the second part, to do so the parties of the first part shall, not within a period of 90 days from date of receiving said notice, place and keep upon sale at the point designated in said notice a sufficient stock of such preparation or mixture to supply the demand therefor, then the rights herein granted within all the territory within a radius of 100 miles of said point shall be forfeited; and provided, further, that a failure on the part of the parties of the first part to keep and perform the conditions and provisions herein contained shall work a forfeiture of their rights hereunder.

"(5) Said parties further agree to buy all of the Coca-Cola syrup necessary to a compliance with this agreement at a price and upon terms set forth below, directly from the party of the second part.

"(6) The parties of the first part agree not to use any substitute or substitutes for or other syrup or substance, nor to attempt to use or imitate with any article made or prepared by them, Coca-Cola syrup.

"(7) Parties of the first part further agree not to sell or in any way dispose of without the written consent of the parties of the second part in every instance any Coca-Cola, except after it is carbonated and bottled.

"(8) In consideration of these agreements on the part of the parties of the first part the party of the second part agrees to sell Coca-Cola syrup to said parties of the first part at one ($1.00) dollar per gallon.  *  *  *

"(13) Said party of the second part further agrees and hereby grants to said parties of the first part, the sole and exclusive right to use the name Coca-Cola and all the trade-marks and designs for labels now owned and controlled by said party of the second part, upon any bottles or other receptacles containing the mixture heretofore described, and the right to vend such preparation or mixture bottled or put up as aforesaid, in all the territory contained in the boundaries of the United States of America, except the six New England states and the states of Mississippi and Texas. This right to use the name Coca-Cola and the trade-mark and label furnished is to be applied only to the carbonated mixture described, and is not intended to interfere in any way with the business and use of the same as now operated by the party of the second part, nor to apply to the soda fountain business as now operated by various parties. The rights of the parties of the first part under this contract may be by them transferred to a company, the formation of which is

now contemplated by them to be known as the Coca-Cola Bottling Company, but no transfer of their rights under this contract to any other party or parties, shall be made without the consent of the party of the second part.

"In witness whereof each of the parties has hereunto affixed their signatures.

    "J. B. Whitehead.     [L. S.]
    "B. F. Thomas.     [L. S.]
    "The Coca-Cola Company,
       "Asa G. Candler, Pres.   [L. S.]"

Coca-Cola Bottling Company, to which Whitehead and Thomas were authorized by the contract to transfer their rights thereunder, was organized under the laws of the state of Tennessee in December, 1899. Whitehead and Thomas conveyed to it all their rights under the contract and became its principal stockholders. Complying with the contract, Coca-Cola Bottling Company established a plant in the city of Atlanta, Ga., "for the purpose of bottling a mixture of Coca-Cola syrup and preparation with carbonic acid and water." It established another at Chattanooga, Tenn. At each of these plants it commenced at its own expense the production of carbonated bottled Coca-Cola. The demand for the bottled product rapidly increased, both in volume and as to territory. The two plants in Atlanta and Chattanooga were unable to do more than meet the demand in those two cities, and as the contract required that the increased demand should be supplied new plants were necessary. At this stage of the business, with the consent of the Georgia corporation, a division was made of the territory embraced in the contract. Coca-Cola Bottling Company retained the Chattanooga plant and certain of the territory, while the Atlanta plant and the remainder of the territory was acquired by the complainant, The Coca-Cola Bottling Company. Each of these bottling companies thereafter proceeded to carry out in its respective territory all the provisions of the contract. Within a few years the complainant, by the expenditure of much time, money, and energy, procured the establishment of many additional plants, now numbering 588, each supplying a defined area with the bottled drink. The additional plants were established under contracts made, with the consent of the Georgia corporation, between the complainant and the owners of the respective local plants. The value of the physical properties now held and owned by the local bottlers in the territory of the complainant is approximately $10,500,000 (and in the territory of Coca-Cola Bottling Company is approximately $10,000,000), while the value of the tangible properties of the defendant amounts approximately to only $5,000,000. On April 24, 1915, at which time a very large proportion of the local plants had been established, the contract above set out was by mutual consent amended (with the exception of the numbers prior to each paragraph which are here added for convenience of reference), thus:

By striking out paragraph 5 and substituting the following in lieu thereof:

(5) "Party of the first part agrees to buy from party of the second part such bottlers' syrup as may be necessary to fully supply said territory with bottled Coca-Cola; and party of the second part agrees to manufacture for and sell to party of the first part all of the Coca-Cola for bottling purposes that may be necessary for or used by said first party in supplying said territory with bottled Coca-Cola."

By substituting the following for paragraph 6:

(6) "In consideration of the consent of The Coca-Cola Company to the use of the name Coca-Cola as a part of the corporate name of party of the first part, and its further consent to use by first party of the trade-mark Coca-Cola on the product so sold, party of the first part agrees not to manufacture, deal in, sell, offer for sale, use or handle, nor to ·attempt to do so, either directly or indirectly, any product that is a substitute for or imitation of Coca-Cola."

By striking out paragraphs 8, 11, and 12, and substituting therefor the following:

(8) "For said syrup so sold, party of first part agrees to pay party of the second part the sum of ninety-two (92c.) cents per gallon. * * * "

By striking from the original contract (with the exception of the words "except the six New England states and the states of Mississippi and Texas") paragraph 13, and inserting in lieu thereof the following:

(11) "For and in consideration of the agreement to sell and agreement to purchase, party of the second part does hereby give and convey to the party of the first part the right to use the trade-mark name Coca-Cola, and all labels and designs pertaining thereto, in connection with the product bottled Coca-Cola, in the territory heretofore obtained by party of the first part, and agrees not to convey, assign, or transfer the right of usage of said name in said territory, to any other party whatsoever; and said party of the second part further agrees to only manufacture syrup for bottling purposes in sufficient quantities to meet the requirements of party of the first part, and of Coca-Cola Bottling Company, and for the requirements of the territory not conveyed by party of the second part to either of said companies. Nothing herein, however, shall give to party of the first part any interest in the name Coca-Cola, labels, etc., except the right of usage in connection with bottled Coca-Cola, nor shall this contract in any way interfere with the use of said name Coca-Cola, labels, etc., in connection with the fountain product of party of the second part; it being understood and agreed that the use herewith given shall be confined to the bottled product, the name, labels, etc., in connection with the fountain product to be used as party of the second part deems fit and advisable, in any and all territory. Party of the second part does hereby select party of the first part as its sole and exclusive customer and licensee for the purposes of bottling Coca-Cola in the territory heretofore acquired by said first party, and second party agrees not to sell its fountain syrup to any one, when party of the second part knows that said syrup is to be used for bottling purposes."

And by adding the following new paragraphs:

(12) "The rights of the party of the first part under this contract shall not be by it transferred in part or in whole, without the written consent of the party of the second part. Transfers heretofore made are hereby recognized, and confirmed by party of the second part."

(13) "Said party of the first part herein having heretofore transferred and assigned the bottling rights in portions of the territory leased and assigned to it, to subbottlers, it is understood and agreed by and between the parties hereto that party of first part shall use its best endeavors to have the provisions of this amended contract accepted by said subbottlers, in so far as this amended contract affects said subbottlers; but that if party of first part herein is unable to obtain the consent of any of such subbottlers to this amended contract, this amended contract shall not apply to any of such subbottlers refusing to accept this amended contract."

(14) "Except as herein provided for, the contract of July 21, 1899, as amended, shall remain in full force and effect; but this amendment shall only apply to the territory now owned or controlled by party of the first part, or

that may hereafter be owned or controlled by party of the first part, and nothing herein contained shall affect any territorial rights heretofore conveyed, given, transferred or assigned."

The old contracts between the complainant and its subbottlers were after the amendment surrendered and terminated, and the substituted, as well as all contracts subsequently made with new subbottlers, were made in a new form. The business of the complainant was at all times conducted without friction between it and the Georgia corporation, each in good faith observing the provisions of the contract. The business of the complainant resulted in very great profit to the Georgia corporation. Such was the situation until August, 1919, at which time the defendant, the Coca-Cola Company, a Delaware corporation, acquired the property, good will, and business of the Georgia corporation, and assumed all the outstanding contracts and liabilities of that corporation. Thereafter the Georgia corporation surrendered its charter. The Delaware corporation elected as its president, as chairman of its board of directors, and as its secretary, former officers of the Georgia corporation. It also made the general counsel of the latter company one of its directors. In the year 1919 the complainant and other persons holding similar rights from the Georgia corporation under the contract of 1899 were purchasing from the latter company and marketing as bottled Coca-Cola approximately 40 per cent. of its output of Coca-Cola syrup, to the very great profit of the latter company. The Delaware corporation, after August, 1919, applied to the complainant for temporary modifications of the contract in the matter of the price to be paid for the syrup, on the ground that the war conditions had so increased its cost of production that the syrup could not be profitably furnished by it at the contract price. The complainant on two different occasions agreed with the Delaware corporation to temporary modifications of the contract, by which the price paid for the syrup to the defendant was greatly increased; the last temporary modification expiring by its terms on March 1, 1920.

Shortly before the expiration of the last-named price modification agreement, negotiations for a third price modification were about to be entered into, when the complainant for the first time learned that the defendant had taken the position that the contract was terminable upon notice at the will of either party. The complainant thereupon refused to agree to a further modification of the price of the syrup unless the defendant would likewise agree at the same time to put forever at rest the question which it had raised as to the terminability of the contract. This the defendant refused to do. Thereupon the complainant on February 27, 1920, served upon defendant herein notice that complainant required compliance with the contract in accordance with its terms. Replying to such communication, the defendant on March 2, 1920, notified the complainant and other bottlers holding contracts similar to that of the plaintiff that the contract would stand terminated on May 1, 1920.

The bill charges that the contract, including amendments, in and of itself constituted a permanent and continuing contract, and not a contract terminable at the will of either party upon notice. The bill

also sets up facts intended to show that the understanding of the parties at the time of making the original contract was that the contract was of a permanent character, and that the subsequent statements and acts of the Georgia corporation were at all times confirmatory of that understanding. It is also alleged that the defendant, in attempting to terminate the contract, is acting in bad faith, and that the defendant desires to obtain contracts in its own interest with complainant's subbottlers for the purpose of securing for itself the benefit of the labor, skill, and money expended by the complainant in establishing and developing the bottling business throughout its territory. It is charged that, if defendant be permitted to breach the contract with complainant, the business of the latter will be annihilated and destroyed, to the irreparable injury of the complainant. The prayers of the bill are, in substance: (a) That complainant's rights under the contract be held and decreed to be continuing, permanent, and perpetual, and not terminable at the will of either party without the consent of the other; (b) for specific performance; (c) for an injunction preliminary and final, enjoining the defendant from violating any of the terms and conditions of the contract and particularly the negative covenants found in paragraph numbered 11 of the amendment of 1915; and (d) for general relief.

Of the grounds urged by the defendant in support of its motion to dismiss, those necessary, in the view I have taken of the case, to be now considered, are: (1) That the contract is a contract at will, terminable upon reasonable notice; (2) that, if perpetual, the contract is void under the law of Georgia, the Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209), and the Clayton Act (Act Oct. 15, 1914, c. 323, 38 Stat. 730); and (3) that, if the complainant acquired any right, title, or interest in the trade-mark, good will, or business of the predecessor of the defendant, the complainant has disposed of all such rights to its subbottlers.

In the motion to dismiss, in the discussion at bar and in the voluminous briefs of the respective parties, numerous other questions have been pressed upon the attention of the court; but the pivotal controversy rests upon the ascertainment of the true meaning of the contract as amended. A decision upon this matter will of itself dispose of many questions, and render a consideration of the others, save only (2) and (3) above stated, unnecessary at this time.

[1] In determining the true import of the contract, certain basic rules of construction must be borne in mind. One of these rules is that, when persons put their contracts in writing, the writing must, in the absence of fraud, accident, or mistake, be taken as the embodiment of their whole engagement, and consequently that its terms may not be varied or controlled by antecedent negotiations or declarations. Bast v. Bank, 101 U. S. 93, 96, 25 L. Ed. 794; Manson v. Dayton, 153 Fed. 258, 262, 82 C. C. A. 588; National Bank of Commerce v. Rockefeller, 174 Fed. 22, 26, 98 C. C. A. 8.

[2] Another rule is that in the performance of the duty of ascertaining and giving effect to the mutual intentions of the parties, as expressed in the contract, the court, so far as possible, may and should

put itself in the position of the parties to the contract, and examine into the state of things existing at the time and the circumstances under which the contract was made. Canal Co. v. Hill, 15 Wall. 94, 21 L. Ed. 64; Gillett v. Bank of America, 160 N. Y. 549, 55, N. E. 292. Courts "are never shut out from the same light which the parties enjoyed when the contract was executed." Nash v. Towne, 5 Wall. 689, 18 L. Ed. 527.

[3] Still another settled rule of construction is that the intentions of the parties as expressed in the contract must be ascertained from the agreement as a whole, from all its terms considered together, for, where a contract has many provisions, it is manifest that the entire intention of the parties was not expressed by any single stipulation, but by every part so construed as to be consistent with every other part and with the contract as a whole. Pressed Steel Car Co. v. Eastern Ry. Co. of Minnesota, 121 Fed. 609, 611, 57 C. C. A. 635; Elliott on Contracts, § 1514.

[4] In applying these principles of interpretation, courts should be constantly on guard lest, unawares, under the guise of construction, and looking too intently for means of bringing about some ultimate good, thwarting an apparent wrong, or preventing hardship, a contract other than that made by the parties be built up. The first of these rules of interpretation carries one beyond the antecedent declarations and negotiations to the time of the making of the contract, the then existing condition of the parties, and the surrounding circumstances, which, under the second rule, are to be considered.

[5] The Georgia corporation was at the time of the execution of the contract the sole and exclusive owner of the secret process or formula under which it had long been engaged in the manufacture and sale of a syrup, theretofore used only as a base for a soda fountain drink that had become known to the public by the name Coca-Cola. It had acquired a good will. It was also the sole and exclusive owner of the trade-name and the trade-mark. In the secret process the Georgia corporation had property or property rights of value that were salable in whole or in part. Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. 658, 33 L. Ed. 67.

[6] A sale of the process might have been accompanied by a covenant that the seller would not thereafter use the process or communicate it to any other person. Such a covenant would have been valid and binding. Central Transp. Co. v. Pullman's Car Co., 139 U. S. 24, 53, 11 Sup. Ct. 478, 35 L. Ed. 55. The process was valuable, however, only because it was a secret, and only so long as it remained a secret. Nims on Unfair Competition and Trade-Marks (2d Ed.) § 142; John D. Park & Sons Co. v. Hartman, 153 Fed. 24, 29, 82 C. C. A. 158, 12 L. R. A. (N. S.) 135.

[7, 8] In its good will, also, the Georgia corporation had property or property rights. Good will may be bought and sold in connection with a business as an incident thereof. Camden v. Stuart, 144 U. S. 104, 115, 12 Sup. Ct. 585, 36 L. Ed. 363; Metropolitan Nat. Bank v. St. Louis Dispatch Co. (C. C.) 36 Fed. 722, 724. The Georgia corporation likewise had property or property rights in its trade-mark.

Trade-marks and the good will of a business are inseparable. In fact, a trade-mark is merely one of the visible mediums by which the good will is identified, bought, and sold, and known to the public. Hopkins on Trade-Marks (3d Ed.) p. 227. Nims on Unfair Competition (2d Ed.) § 15.

"The trade-mark is the expression, the symbol, of part or all of the good will of the business using the mark. * * * Separate from the good will of the business it identifies, it is useless, valueless. * * *" Nims on Unfair Competition, p. 378.

[9] A trade-mark is not a right in gross or at large. As an abstract right, wholly disassociated from the business or merchandise with which it has become established, it is not property, and may not be assigned. United Drug Co. v. Rectanus Co., 248 U. S. 90, 39 Sup. Ct. 48, 63 L. Ed. 141. For no one may sell his goods as the goods of another. Such an act would be a fraud upon the public. But, where the trade-mark of a retailer is assigned by him to the manufacturer of the commodity to which the trade-mark was affixed, there is no false representation to the public, and such assignment is valid. Witthaus v. Braun et al., 44 Md. 303, 22 Am. Rep. 44. The last proposition arises, apparently, from the fact that a trade-mark does not as a matter of necessity and law import that the articles upon which it is used are manufactured by the user. It is sufficient that they are manufactured for him, that he controls their production, or that in the course of trade they pass through his hands. Nelson v. Winchell & Co., 203 Mass. 75, 89 N. E. 180, 23 L. R. A. (N. S.) 1150; McLean v. Fleming, 96 U. S. 245, 253, 24 L. Ed. 828. If a retailer may assign his trade-mark to the manufacturer of the article sold by the retailer, it would seem that the converse is necessarily true, and that the manufacturer may assign his trade-mark to another, who sells the goods of the manufacturer.

[10] The Georgia corporation was not at the time of the execution of the contract the owner of an actual bottling business, for theretofore it had not actually bottled the drink Coca-Cola. It was, however, the sole and exclusive owner of the secret process, was the sole manufacturer of the syrup made thereunder, and was the exclusive owner of the trade-mark and good will. The drink could be bottled. This fact appears from the contract itself. It follows that the Georgia corporation, though not then actually engaged in bottling the drink, was the sole owner of all the rights essential to the bottling and sale thereof as Coca-Cola. Out of these rights the business of bottling the drink and selling it as Coca-Cola could arise. Without these rights such business could not be established. From these facts it seems clear that at the time of the execution of the contract the business of bottling the Coca-Cola and selling it when bottled had a potential existence, that all rights in the potential bottling business were owned by the Georgia corporation, and that such business, though potential, and not actual, could be sold. Dickey v. Waldo, 97 Mich. 255, 56 N. W. 608, 23 L. R. A. 449; Barron v. San Angelo Nat. Bank (Tex. Civ. App.) 138 S. W. 142, 144; Benjamin on Sales, § 78; 2 R. C. L. § 4, p. 596.

Having ascertained the surrounding circumstances and placed the

contract in its original setting, the next step is to apply to it the above-mentioned third rule of construction, and to search for the meaning of the contract from the agreement as a whole, from all its terms considered together, remembering that in a contract of many provisions the entire intention of the parties is not expressed by any single stipulation, but by every part so construed as to be consistent with every other part and with the contract as a whole.

The complainant contends that the agreement granted and conveyed or assigned to it the sole and exclusive right to use in its territory the trade-mark and trade-name upon bottled Coca-Cola; that this was a transfer of property or property rights to which the covenant of the Georgia corporation to manufacture for and to sell to the complainant Coca-Cola syrup was ancillary and incidental; and that therefore the contract is not at will but of perpetual duration. The defendant, on the other hand, insists that the contract was one for the purchase and sale of Coca-Cola syrup; that the remaining covenants are ancillary and incidental to the covenants for such purchase and sale; and that, consequently, the contract, if valid, was a contract at will.

What are the stipulations of the instrument? It begins with covenants dealing from various aspects with the establishment of the business "of bottling a mixture of Coca-Cola syrup and preparation with carbonic acid and water." Paragraph 1 requires the establishment in Atlanta by Whitehead and Thomas of a bottling plant; paragraph 2 requires that the plant shall be established without expense to the Georgia corporation; paragraph 3 prescribes the relative proportions of the ingredients of the bottled drink and the pressure under which the drink is to be bottled; and paragraph 4 specifies the extent to which the bottling business must be carried on under penalty of forfeiture. Paragraph 5 is a covenant by Whitehead and Thomas to buy all syrup "necessary to a compliance" with the agreement directly from the Georgia corporation; paragraph 6 prohibits the use by the bottlers of imitations and substitutes for the Coca-Cola syrup; and paragraph 7 is a covenant of the bottlers not to sell Coca-Cola "except after it is carbonated and bottled." In consideration of the foregoing stipulations of the bottlers, the Georgia corporation in paragraph 8 agreed to sell Coca-Cola syrup to the bottlers at a fixed price, and by paragraph 13 it "grants" to the bottlers "the sole and exclusive right to use the name Coca-Cola and all the trade-marks and designs for labels now owned and controlled by" the Georgia corporation "upon any bottles or other receptacles containing the mixture * * * described," and the right to sell the same in the prescribed territory.

The amendment of 1915, as I understand that amendment, makes no substantial change in the above-stated provisions, save in the price to be paid for the syrup. Otherwise it is, in substance, only an expression of what was expressed in or necessarily implied from the original contract. I am not overlooking that part of paragraph 11 of the amendment which says:

"Party of the second part [the Georgia corporation] does hereby select party of the first part [the complainant] as its sole and exclusive customer and licensee for the purpose of bottling Coca-Cola in the territory heretofore acquired by said first party."

This clause did not, however, in my view of the contract as a whole, either diminish the rights of the complainant obtained through the original contract or enlarge them.

[11] What was the paramount purpose of the contract, as ascertained from the agreement as a whole? In my opinion it was the establishment of the business of bottling the Coca-Cola drink by Whitehead and Thomas. As I understand the contract, the rights in good will and trade-mark name acquired under the contract by the bottlers were the same in character and as permanent as if the Georgia corporation had sold to them an established bottling business with its trade-marks and good will. A contract merely for the purchase and sale of syrup would not be a repository for covenants making obligatory on the part of the purchaser the establishment of bottling plants having a capacity sufficient to supply the greater part of the nation and restricting the resale of the syrup, "except after it is carbonated and bottled"; nor would it be a repository for a grant of the sole and exclusive right to use the trade-mark of the vendor, not upon the syrup, but upon the product of those bottling plants.

I find nothing in the contract or the circumstances attending its making to indicate that these covenants are subordinate or incidental to the covenant for the purchase and sale of syrup. On the other hand, the contract and the surrounding circumstances show that such covenants and the covenants to purchase and sell syrup are co-ordinate and of equal rank. A contract so constituted shows an essential object and purpose immeasurably broader than the mere purchase and sale of syrup. Its real purpose neither lies in nor is revealed by any single covenant or provision, but is evinced by the result obtained by combining all the covenants. That result is the sale and purchase of a potential business and the establishment of an actual business. This result is the whole, of which each covenant is merely a part. To this whole each covenant, when separately considered, is ancillary and incidental. In the transaction property rights passed from the Georgia corporation to the bottlers. The forfeiture clauses are also more in keeping with this conclusion, for while of themselves they may be an insufficient foundation upon which to base a conclusion that the contract does pass property or property rights, or is not a contract at will, yet it is manifest that in a contract passing property rights, or in a contract not at will, forfeiture clauses have a greater utility.

A sufficient consideration for this sale is the establishment by the purchaser of the plant or plants requisite to supply the demand of the specified territory. This has been done. The method and means by which these plants (other than the Atlanta plant, which was established in conformity with the contract) have been established is no concern of the defendant, and is irrelevant to the question as to the character and duration of the contract. The value of the tangible assets of the plants (aggregating in the territory covered by the original contract upwards of $20,000,000) necessary to comply with the covenants of the fourth paragraph of the contract may, however, be relevant to the question of duration of the contract, as showing an improbability that it was the intention of the parties that the contin-

uance of a business of such magnitude, requiring for its establishment such an enormous outlay of capital, should be dependent upon the arbitrary will of any one party. It is reasonable to infer that, in building up a bottling business "to supply the demand in all territory embraced in the agreement," Whitehead and Thomas desired to build that business upon a sound business foundation; otherwise, the agreement could have been limited to a contract for the purchase and sale of syrup. But it was not so limited.

To build upon a firm business basis, Whitehead and Thomas needed all rights of the Georgia corporation in its potential bottling business for the specified territory. Had the Georgia corporation, at the time of making the contract, been the owner of an actually established business of bottling the Coca-Cola drink, the language of transfer might aptly have been somewhat different from that used by the parties in the contract under consideration; but the bottling business not having been actually established by the Georgia corporation, and it being merely the owner of rights which gave to the bottling business only a potential existence, the language employed seems appropriate and fitting for the purpose of divesting the Georgia corporation of all rights that it had to convert the potential business into an actual business, and likewise to clothe Whitehead and Thomas with such rights.

The secret process or formula having a value only so long as it should be kept secret and the probability of its public disclosure increasing with the increase in the number of persons to whom it might become known by disclosures in the course of business, the Georgia corporation probably eliminated from consideration any question of an assignment of the secret process or formula to Whitehead and Thomas for use by them to the extent of their business needs in the manufacture of Coca-Cola syrup for bottling purposes. Had it adopted this method, it could have sold, either for a consideration then paid or upon a royalty basis, the secret process for use in making Coca-Cola syrup for bottling purposes. Such a sale could have been accompanied, as appears from the authorities hereinbefore referred to, by a covenant preventing the future use of the formula for making the syrup for bottling purposes by the Georgia corporation, its successors and assigns, and by a grant of the sole and exclusive right to use the trade-mark and trade-name upon the bottled product in the prescribed territory. Such a sale would have carried with it all rights of the Georgia corporation in the potential bottling business.

This method was, however, not adopted by the parties, for the Georgia corporation retained the secret, and consequently the legal title thereto. The owner of such potential business could, however, by contract based upon a valuable consideration, and without the sale of the process, confer upon a vendee all rights which it, the vendor, might have in such business. This could be accomplished by the grant of the use of the trade-mark and trade-name, accompanied by an agreement to sell to the vendee such syrup made under the formula as might be necessary to fully supply with bottled Coca-Cola the demand of the territory acquired by the vendee, embodying covenants that it would thereafter manufacture under the secret formula syrup

for bottling purposes only in sufficient quantities to meet the demand of the vendee's territory, and that it would not sell its fountain syrup to any one when the vendee "knows that said syrup is to be used for bottling purposes."

[12] Such an agreement the Georgia corporation, by the contract under consideration, made. Thereby it conferred upon the bottlers the right to acquire the syrup and it transferred to them an interest in its good will and trade-mark and trade-name, the cumulative effect of which was the transfer of the potential bottling business. The right to transfer the good will is clear. The Georgia corporation had acquired a good will and a trade-mark arising out of and connected with the fountain drink. It is to be assumed that the bottled drink and the fountain drink were substantially identical; the bottled drink, by reason of its being bottled, being merely more available for general use. Necessarily the favor which the Georgia corporation had won from the public for its fountain drink would, at least in part, inure to the advantage of the bottled drink, should the latter be labeled so as to identify it with the fountain drink. The Georgia corporation consented to this labeling, and granted and conveyed to the bottlers "the right to use the trade-mark name Coca-Cola, and all labels and designs pertaining thereto, in connection with the product bottled Coca-Cola" in the prescribed territory. The extent of the good will, symbolized by the trade-mark, so transferred, is disclosed by the grant of the "sole and exclusive" right thus to use the name and trade-mark, or, as expressed in the amendment, by the negative covenants of the Georgia corporation that it will "only manufacture syrup for bottling purposes in sufficient quantities to meet the requirements" of complainant and others holding similar rights under the contract, and that it will not sell its fountain syrup to any one when the complainant "knows that said syrup is to be used for bottling purposes." The good will so transferred was, as to the bottling business, perpetual and exclusive.

[13] The transfer of the interest in the trade-mark was not a transfer in gross. The right to transfer the good will and trade-mark under such circumstances is shown by the authorities hereinbefore referred to. As I see it, it is immaterial whether the interest in the trade-mark acquired by the bottlers was a legal title or merely a beneficial interest. Though not made the basis of the decision upon this matter, it may be noted that the defendant does not dispute the right of complainant to use the trade-mark during the continuance of the contract. Consequently the ultimate question touching the trade-mark would thus seem to be, not whether the trade-mark could be assigned, but merely the extent of the interest assigned. If a limited interest therein by way of license could have been assigned, no reason appears why, under the circumstances, an unlimited interest could not likewise have been assigned.

In view of the use of the word "grants," denoting a transfer of property, in the original contract, and the significance in the use of the words "give and convey," being of like import with the word "grants," in the amendment 15 years later, to confer upon the plaintiff or its predecessors in interest the right of user, in the absence of

words of limitation, and in the light of the fact that the essential object and purpose of the contract was the building up of the bottling business at much expense adequately to meet the contractual provisions, I am unable to find any sound principle upon which to base a conclusion that the right so conveyed was other than an absolute and unlimited right of user in the complainant to the exclusion of all others, including the Georgia corporation, its successors and assigns, in the territory in question. In fact the Supreme Court has held that—

"If the owner [of a trade-mark] imposes no limitation of * * * time [upon the right to use the trade-mark], the right to use is deemed * * * perpetual." Kidd v. Johnson, 100 U. S. 617, 619 (25 L. Ed. 769).

Did the contract confer upon the bottlers a right to acquire from the Georgia corporation the Coca-Cola syrup necessary to the establishment and conduct of the bottling business? Paragraph 5 of the amendment of 1915 provides:

"Party of the first part [the bottler] agrees to buy from party of the second part [the Georgia corporation] such bottlers' syrup as may be necessary to fully supply said territory with bottled Coca-Cola; and party of the second part agrees to manufacture for and sell to party of the first part all of the Coca-Cola for bottling purposes that may be necessary for or used by said first party in supplying said territory with bottled Coca-Cola."

The defendant, regarding the contract as one merely for the purchase and sale of syrup, insists that it is so lacking in mutuality of obligation and so indefinite as to time and subject-matter as to be void. Having concluded that the covenant to sell syrup is not the dominant covenant of the contract, to which all others are incidental and subordinate, but that it is merely one of a number of co-ordinate covenants, the objections as to mutuality and certainty become of less importance, yet they are not wholly eliminated.

[14] The objection that there is a lack of mutuality is based upon the assumption that the only consideration for the promise to sell the syrup is the reciprocal promise to buy. This assumption is not well founded. The express covenant on the part of the bottlers to erect a bottling plant, and their implied covenant to erect or cause to be erected bottling plants sufficient to supply the demand of the territory with the bottled drink, both of which have been performed, constitute sufficient consideration for the covenants of the Georgia corporation. Consideration has been defined as:

"The price, motive, or matter of inducement to a contract—whether it be the compensation which is paid, or the inconvenience which is suffered, by the party from whom it proceeds."

And again as:

"Any act of the plaintiff from which the defendant or a stranger derives a benefit or advantage, or any labor, detriment, or inconvenience sustained by the plaintiff, however small, if such act is performed or inconvenience suffered by the plaintiff by the consent, expressed or implied, of the defendant." Bouvier's Dictionary, Rawle's 3d Rev.

The Atlanta bottling plant was built, and the remaining 587 plants in complainant's territory have been built, equipped, and operated without expense to the Georgia corporation or the defendant. That the plants are not now owned by the complainant is a fact irrelevant to

the matter under discussion. "Want of mutuality is no defense to either party, except in cases of executory contracts." Grove v. Hodges, 55 Pa. 504, 516; Chicago, M. & St. P. Ry. Co. of Idaho v. United States, 218 Fed. 288, 301, 134 C. C. A. 84. In Wilson v. Clonbrock Steam-Boiler Co. (C. C.) 105 Fed. 846, Judge McPherson, quoting from Morse v. Bellows, 7 N. H. 549, 28 Am. Dec. 372, said: ·

"Nor is it necessary that the consideration should exist at the time of making the promise; for if the person to whom a promise is made should incur any loss, expense, or liability in consequence of the promise, and relying upon it, the promise thereupon becomes obligatory."

[15] The contract is not wanting in mutuality of obligation. Has it sufficient certainty as to subject-matter and time of performance? When the provisions of paragraphs 4 and 5 of the agreement as amended in 1915 are read together, it is clear that the bottler is bound to buy, and the manufacturer of the syrup is bound to manufacture and sell to the bottler, not merely such syrup as the bottler may desire, but sufficient syrup to enable the bottler to supply the demand for the bottled drink in all territory embraced ·in the agreement. Manifestly the agreement is not of that class where the amount of the commodity to be furnished depends upon the wish, will or desire of either party. A contract to furnish goods, material, or other commodity sufficient for the needs of a specified undertaking is not invalid for uncertainty. Select Pictures Corporation v. Australasian Films (D. C.) 260 Fed. 296; Lima Locomotive & M. Co. ·v. National Steel C. Co., 155 Fed. 77, 83 C. C. A. 593, 11 L. R. A. (N. S.) 713. Mere indefiniteness as to the exact amount of material to be purchased or sold under a contract is not necessarily a fatal uncertainty. Elliott on Contracts, § 180. If the intention of the contract be clear, the mere uncertainty as to the exact amount involved does not invalidate it. Ramey Lumber Co. v. John Schroeder Lumber Co., 237 Fed. 39, 150 C. C. A. 241.

The manifest intention of the parties to the contract under consideration was that the demand of the granted territory for the bottled drink should be supplied. The exact quantity of syrup necessary to supply this demand could not in the very nature of things have been fixed at a specified number of gallons. A provision in the contract so fixing the quantity of·syrup to be sold and purchased would not have been in keeping with the dominant intention of the parties. Having in mind the paramount object of the parties to the contract, it is difficult to find a measure of supply more suitable to the purposes of the contract or more definite than that employed by the parties themselves. That the quantity of syrup to be supplied was sufficiently definite for the purposes of the contract to enable the parties thereto to comply therewith has been fully demonstrated by a practical test of 20 years' duration.

Furthermore, as the, business continued from year to year, and the extent of the demand for the bottled drink became known, such uncertainty as originally existed in the contract necessarily in large measure disappeared. It should be observed that the Georgia corporation, and not the bottlers, fixed the standard by which the supply was to be measured, and that this was the same standard under which the

bottler was required to establish or cause to be established, under penalty of forfeiture of all contractual rights, bottling plants adequate to manufacture the bottled drink in quantity sufficient to supply the demand of all territory embraced in the agreement.   Much stress has been laid by the defendant upon the case of McCaw Mfg. Co. v. Felder, 115 Ga. 408, 41 S. E. 664; but that case involved a contract of a character radically different from the contract under consideration. Yet that and similar cases cited by the defendant required only that the contract be sufficiently definite, which necessarily means sufficiently definite under all the circumstances of the contract, having in mind its essential object and purposes.   The contract is sufficiently definite as to subject-matter.

[16] Is it sufficiently definite as to time?   This point was made, but scarcely pressed, for the defendant made its real defense upon the ground that the contract was a contract at will—a position inconsistent with that of a lack of certainty as to time.   But, aside from the inconsistent attitude of the defendant, is it possible to say how long the covenant to supply syrup runs?   Though essential to the contract, this covenant is but incidental to its main purpose.   As the business established upon the faith of the contract could not continue without syrup, the period for which the syrup must be supplied is found by ascertaining the duration of the contract.   From what has already been said it appears that the contract is not a contract at will, but that it is a contract permanent and perpetual in its nature.   Manners v. Morosco, 252 U. S. 317, 40 Sup. Ct. 335, 64 L. Ed. 590; Western Union Telegraph Co. v. Pennsylvania Co., 129 Fed. 849, 858, 64 C. C. A. 285, 68 L. R. A. 968.   The bottling business rests upon the joint existence of two things—the continued secrecy of the process for making the syrup and the continued demand for the bottled drink.   So long as both of these conditions exist, the contract endures.   The fact that no plan was provided for in the contract for changing the price to be paid for the syrup does not alter this result.   It may well be that the price so fixed embraced such a large margin of profit that a fluctuating scale of prices was deemed unnecessary.

[17] It is next contended by the defendant that, if the contract be construed as it is now construed by the court, it is void under the law of Georgia, the Sherman Act and the Clayton Act.   In this connection it should be observed that the effect of the contract was not a merger or consolidation of businesses theretofore existing in severalty, but was the complete severance of the bottling business from the business of supplying soda fountains with the syrup, while the result which the defendant seeks under statutes intended to prevent monopoly would give to the defendant a complete and exclusive monopoly of both the fountain business and the bottling business.   The accomplishment of this result through the instrumentality of the anti-monopoly statutes would, indeed, be unique.   That of necessity there is competition between the bottled drink and the fountain drink cannot be seriously questioned. The contract did not fix a price for the bottled drink.   It did not fix a price for the fountain drink.   The defendant may sell its fountain syrup for such price as it pleases subject to the inevitable result, if it

raises its price too high, that the demand for the fountain drink will decrease, and that for the bottled drink increase. The converse would, of course, be true, should the price of the bottled drink greatly exceed that of the fountain drink.

The defendant points out certain covenants of paragraphs 6, 7, 11, and 12 of the contract as amended in 1915 to show that the contract is in restraint of trade. It cites Floding v. Floding, 137 Ga. 531, 73 S. E. 729, and other cases, to show that the courts of Georgia refuse to recognize an agreement not to operate the same business in a territory very large in area as being in reasonable restraint of trade. But such cases have no analogy to the case at bar, where the effect of the contract was not to transfer the whole business of the vendor, but only an incidental and potential business arising out of the main business of the vendor. It is unnecessary to analyze the several covenants pointed out as being in unreasonable restraint of trade. Those covenants at most operate as a partial and not as a general restraint, and are "merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party," or were covenants necessary to protect the Georgia corporation in its retained business. Such provisions are valid. United States v. Addyston Pipe & Steel Co., 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122; John D. Park & Sons Co. v. Hartman, 153 Fed. 24, 82 C. C. A. 158, 12 L. R. A. (N. S.) 135. I find in the contract nothing having an effect or intended to have an effect to defeat or lessen competition or to encourage or tend to create a monopoly, nor do I find anything therein that may be said to be in unreasonable restraint of trade.

The defendant has also suggested, rather than urged, that even if the complainant acquired any right, title, or interest in the trademark, good will, or business of the predecessor of the defendant, the complainant has disposed of all such rights to its subbottlers. This objection is based upon the provisions of the contract between the complainant and its 588 subbottlers, each of such contracts so far as disclosed being in the same form. Under those contracts the bottler conveyed to the subbottler the right the former "received from The Coca-Cola Company to use the trade-mark name Coca-Cola, and all labels and designs pertaining thereto in connection with the product bottled Coca-Cola" in the territory of the subbottler. The bottler agreed to obtain and furnish to the subbottler at $1.20 per gallon sufficient syrup for bottling purposes to meet the requirements of the subbottler in his specified territory. The subbottler agreed, in substance, to buy of or through the bottler at the specified price all syrup required or used by the subbottler; to invest in and maintain a plant and equipment sufficient to meet the demands of the business in its territory; to allow the bottler to enter upon and examine the premises where the Coca-Cola should be bottled and prepared for market; and to allow the bottler to make any necessary examination to see that the provisions of the contract were complied with. It was further agreed that, so long as the subbottler should comply with the terms of its contract, the

rights, privileges, and immunities thereby granted to the subbottler should remain in full force and effect.

The obligations imposed upon the complainant by its contract with the Georgia corporation still rested upon the former, notwithstanding its contracts with the subbottlers. The complainant also retained a beneficial interest in the bottling business after making the contracts with its subbottlers. Whether the interest so retained makes the Coca-Cola Bottling Company "the real party in interest" within the contemplation of equity rule 37 (198 Fed. xxviii, 115 C. C. A. xxviii) is a question that need not now be determined, for some of the subbottlers, on behalf of themselves and all other subbottlers to whom defendant contends the complainant has sold all its interest in the business, good will, and trade-mark, have been granted leave to intervene, reserving to the defendant the right to raise any question with respect to such intervention.

[18] The right of the subbottlers so to intervene is supported by Osborne v. Wisconsin Cent. R. Co. (C. C.) 43 Fed. 824, and Prentice v. Duluth Storage & Forwarding Co., 58 Fed. 437, 7 C. C. A. 293. In the former case Mr. Justice Harlan, sitting at circuit, held that—

"Where a number of persons have separate and individual claims and rights of action against the same party, but all arise from some common cause, are governed by the same legal rule, and involve similar facts, and the whole matter might be settled in a single suit brought by all these persons uniting as coplaintiffs, or one of the persons suing on behalf of the others, or even by one person suing for himself alone," one or more may sue for the whole.

In the latter case Judge Sanborn, speaking for the Circuit Court of Appeals for the Eighth Circuit said:

"That this suit was well and wisely brought admits of no discussion. Owners of lots in severalty, in possession under a common source of title, may join in a bill of peace to quiet their title, * * * the validity of which depends entirely upon the superiority of the title of their common grantor. The law and the facts which determine the validity of the title of one such owner also determine the validity of the title of every such owner. While they are owners in severalty, they are united in interest in the sole question at issue in such a case—the validity of the title of their common grantor. A suit based upon such a bill is of general equitable cognizance. It prevents a multiplicity of suits, and affords the only adequate remedy for such a multitude of several owners, * * * when their common source of title is assailed."

It is also provided by equity rule 37 that—

"All persons having an interest in the subject of the action and in obtaining the relief demanded may join as plaintiffs. * * *"

Both The Coca-Cola Bottling Company and the subbottlers have an interest in the subject of the action and in obtaining the relief demanded by the bill of complaint. The objection of the defendant to the intervention of the subbottlers cannot be sustained. It follows that all persons having an interest in the subject of the action and in obtaining the relief demanded are now before the court, seeking its aid in protecting the business, good will, and trade-mark rights, granted and conveyed by the contract of 1899 as amended in 1915, from viola-

tion by the defendant. It therefore becomes unnecessary now to determine the relative rights of such persons.

Inasmuch as it appears from the bill of complaint that the contract of 1899 granted and conveyed property rights in and to a business, good will, and trade-mark, and inasmuch as it also appears that such contract was valid, that it was not a contract at will, that all persons having any interest therein are before the court, and that the defendant is threatening to infringe those rights, the motion to dismiss the bill of complaint must be denied. Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550, and, as to good will, 12 R. C. L. p. 988.

The complainant's motion for preliminary injunction remains to be considered, but as the numerous affidavits and voluminous documentary exhibits filed in support of and in opposition to this motion cast no doubt upon any of the facts upon which the denial of defendant's motion to dismiss the bill of complaint is based, it follows, without further consideration, that the complainant is entitled to a preliminary injunction enjoining and restraining the defendant from infringing the property rights in good will and trade-marks granted and conveyed by the contract of 1899 as amended. As an injunction so limited may tend to bring about a result fair and just to all parties, I deem it unnecessary now to consider whether the complainant is entitled to a decree, absolute or upon terms, directing compliance with the covenant of the owner of the secret process to manufacture for and sell to the bottler all of the Coca-Cola syrup for bottling purposes that may be necessary for or used by the bottler in supplying the prescribed territory, and consequently consideration of that matter will be deferred until final hearing, unless the complainant shall in the meantime find that an earlier determination is essential for its protection and renew its application for a mandatory injunction.

An order denying the motion of the defendant to dismiss the bill of complaint, and a decree for a preliminary injunction in accordance with this opinion, may be submitted.